**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CAROL TOKASH,

      Plaintiff,

          v.

FOXCO INSURANCE MANAGEMENT
SERVICES, INC., and EXCALIBUR
INSURANCE MANAGEMENT
SERVICES, INC.

      Defendants.

CIVIL ACTION NO. 3:10-cv-872

(JUDGE CAPUTO)

## MEMORANDUM

    Presently before the Court is Defendants Foxco Insurance Management Services, Inc. and Excalibur Insurance Management Services, Inc.'s Motion for Summary Judgment. (Doc. 23.)  In her Complaint, Plaintiff Carol Tokash alleges she was fired on account of her age and has made claims against the Defendants predicated on the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 955 *et seq.*[1]  The Defendants argue that Tokash was only employed by Defendant Foxco, an entity too small to be subjected to the ADEA, and that even if the ADEA did apply, that Tokash has failed to provide facts suggesting that her dismissal was pretextual.  Because there is evidence in the record suggesting the Defendants were a sole employer and potentially discrediting their stated reasons for

---

[1]In her Brief in Opposition, Tokash withdrew her claims of discrimination on account of gender under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the PHRA (Counts II and IV of her Complaint).  (Pl.'s Br. at 7 n.1, Doc. 35.)  As such, summary judgment will be granted on those claims.

Tokash's termination, summary judgment will be denied on those issues.

## BACKGROUND

Around the end of the first quarter of 2008, Charles "Chuck" Volpe, Jr.–acting as President and CEO of the Defendant corporations–determined that layoffs were financially necessary. (Defs.' Stmt. at ¶¶ 16, 17.) Ultimately, five employees were laid off, one of which was Plaintiff Carol Tokash. (*Id.* at ¶ 26.) Tokash was employed by Defendant Foxco for over thirteen years before her separation on August 29, 2008 and was sixty-six years old on that date. (*Id.* at ¶¶ 12, 41-42.) Although Tokash was notified that she was laid off in March of 2008, she was allowed to continue working until August 29, 2008. (*Id.* at ¶ 27.) During that period, however, Tokash trained a younger employee who also had been laid off so that the younger employee could be brought back to assume Tokash's former duties as well as her own. (*Id.* at ¶¶ 34, 36.) After leaving Foxco, Tokash filed the instant Complaint on April 23, 2010. In pertinent part, Tokash brings claims of age discrimination based on comments made to her following her layoff and departure and on the Defendants' apparent policy of mandatory retirement at age sixty-five.

## I.     The Relationship Between the Defendant Entities

Foxco Insurance Management Services, Inc. was a Pennsylvania close corporation created on March 5, 1986. (Defs.' Ex. B.) Excalibur Insurance Management Services, Inc. was a Pennsylvania business corporation created on August 23, 1991. (Defs.' Ex' C.) Foxco provided insurance related services to housing and development authorities. Specifically, Foxco acted as appointed Attorney-in-fact to the Housing and Redevelopment Insurance Exchange ("H.A.R.I.E."), an "inter-indemnification reciprocal insurance exchange operating

and insuring entities across the Commonwealth of Pennsylvania." (Defs.' Stmt. at ¶¶ 6-7, Doc. 24.)   On the other hand, Excalibur insured workers' compensation programs for municipalities and the like. (*Id.* at ¶ 10.)  Since this action was filed, both corporations have been dissolved and consolidated into Excalibur, LLC. (*Id.* at ¶ 11.)

Plaintiff Carol Tokash began work with Defendant Foxco on October 3, 1994. (Tokash Dep. 27:7-10, Oct. 13, 2011.)  During her employment with Foxco, Tokash was "primarily tasked with performing underwriting services for the property and casualty lines of insurance solely for housing and redevelopment authorities across the Commonwealth of Pennsylvania." (Defs.' Stmt. at ¶ 14.) Tokash, however, performed work for Excalibur at the intersection of Defendants' two businesses: underwriting services for workers' compensation lines of insurance for housing and redevelopment authorities. (*Id.* at ¶ 15.)  Tokash received her paychecks from Foxco (*Id.* at ¶ 13), and does not contest that she was in fact employed by Foxco Insurance Management Services though she did not recall any formal employment contract. (Tokash Dep. at 24:9-16, 34:5-8, 31:21-32:3.)  Linda Williams, the Vice President of Foxco, has been Tokash's supervisor since she began with Foxco. (Defs.' Stmt. at ¶ 21, Doc. 24.) At times, however, Tokash was also supervised by Jerry Wallick, the underwriting supervisor for Excalibur. (*Id.* at ¶ 22.)  Wallick worked in the same office as Tokash, the Chestnut Street Office in Dunmore, Pennsylvania. (Tokash Dep. at 48:3-5, 27:11-28:8.)

Charles "Chuck" J. Volpe, Jr. was both president and CEO of Excalibur since its inception in 1991 and of Foxco since 1998. (Charles "Chuck" J. Volpe Dep. 6:23-7:8, Oct. 12, 2011.) Mr. Volpe testified that, although not entirely sure about the exact proportions, he held the majority of Excalibur shares (around sixty percent) while his three sisters held

the remainder.  (*Id.* at 10:23-11:9.)  He was less sure about Foxco, but indicated that it was the "reverse of Excalibur" with his mother, Eleanor Volpe, as the primary shareholder with the siblings sharing the rest of the shares.  (*Id.* at 11:11-11:17.)

Mr. Volpe directed the work for both entities (*Id.* at 22:12-14), and Tokash considered him to be her boss.  (Tokash Dep. at 45:17-20.)  Though he did not testify that Tokash was expressly subject to the supervision and direction of the respective managements of the two corporations, Mr. Volpe explained she was at least subject to his management.  (C. Volpe Dep. at 25:17-21.)  Mr. Volpe further explained that while Tokash was a Foxco employee, she assisted on the workers' compensation accounts for Excalibur but was subject primarily to the supervision and direction of Foxco.  (*Id.* at 24:21-25:13.)  He maintained that the two corporations "had distinct legal entities and responsibilities" (*Id.* at 24:14-15), and it was his belief that "they were separate companies and separate employees."  (*Id.* at 183:5-11.)  Each made separate filings with the Department of State and each corporation's employees received distinct paychecks and W-2s.  (*Id.* at 186:8-187:20.)  However, Mr. Volpe stated that he treated these organizations as "one big umbrella" and was "not exactly sure what are the Foxco employees and what are the Excalibur employees."  (*Id.* at 24:8-13.)

## II.    Plaintiff Tokash's Layoff

In the first quarter of 2008, the Defendants combined lost approximately one million dollars in revenue.  (Defs.' Stmt. at ¶ 16.)  In his testimony, Mr. Volpe indicated that it was this loss that specifically triggered his decision to implement layoffs.  (C. Volpe Dep. at 143:12-144:2.)  While Mr. Volpe retained ultimate managerial authority, he indicated that he enlisted advice from other Foxco and Excalibur managers in the layoff process, including

4

Linda Williams, Jack Judge, Jerry Wallick, and Michael Doyle. (Defs.' Stmt. at ¶ 19; C. Volpe Dep. at 31:10-32:2, 54:14-21.) Ultimately, Volpe laid of five employees: Joseph P. Schirra, Carol Tokash, Cathy Alexander, Marion Sillner, and Laura Moore. (Defs.' Stmt. at ¶ 26.)

Tokash was notified that she had been laid off in March of 2008. (*Id.* at ¶ 27.) While the other laid off employees departed shortly after notice of their layoffs, Tokash was allowed to stay on with full pay and benefits until August 29, 2008. (*Id.* ¶¶ 27-28, 41.) At the time of her layoff and separation, Tokash was sixty-six (66) years old. (*Id.* at ¶¶ 42, 61; Tokash Dep. at 6:23-25.) At their respective dates of layoff, Moore was thirty-three (33) years old, Schirra seventy-three (73), Alexander forty-six (46), and Sillner forty-nine (49). (Pl.'s Ex. X.) Laura Moore was called back on approximately September 1, 2008 to work in a newly-created position comprised of Moore's and Tokash's combined former positions. (Defs.' Stmt. at ¶ 34.) Linda Williams testified that Mr. Volpe elected to give Tokash time to get her affairs in order, that he could not afford to keep both on payroll at the same time, and that Moore agreed to be laid off until Tokash finally left. (Linda Williams Dep. 71:19-72:3, Oct. 12, 2011.) As such, during July and August of 2008, Moore came into the office to receive training from Tokash on underwriting duties. (Defs.' Stmt. at ¶¶ 36-37.)  Joseph P. Schirra was also recalled to work six (6) months after his layoff. (*Id.* at ¶ 60.)

Throughout her entire employment with Foxco, Linda Williams was Tokash's supervisor. (Defs.' Stmt. at ¶ 21.) In her deposition, Linda Williams testified that Tokash's performance was merely adequate. While she "handled the responsibilities of the housing authorities very well," she had issues with new tasks such as tax credit properties. (Linda Williams Dep. at 45:18-46:14.) Williams also testified that she had expressly recommended

5

that Tokash be one of the laid off employees because Williams felt that Laura Moore would be a better fit for both the underwriting and regulatory reporting. (*Id.* at 70:21-71:7.) While Moore would need to be trained in the underwriting, Williams was not confident in Tokash's ability to "to grasp a new idea" or her ability "to keep up to the[] regulator reports." (*Id.* at 71:7-16.)

In his deposition, Mr. Volpe confirmed that the layoffs he executed were triggered by economic issues, specifically the Defendants' million dollar revenue loss in the first quarter of 2008. (C. Volpe Dep. at 143:12-15.) And, once it became clear that such layoffs were necessary, his determinations were based on the value of a particular employee to the company. (*Id.* at 144:3-12.) As to Tokash, Mr. Volpe's decision was founded on the input he received from his subordinates, a decision he based on the "totality of the circumstances." (*Id.* at 191:19-24, 123:3-17, 144:11-12.) Mr. Volpe confirmed Williams's recollection that Tokash "struggled with some of the changes that were occurring." (*Id.* at 93:23-94:2.) In particular, he expressed that Tokash was "having a very difficult time in terms of dealing with what the underwriting guidelines were for non-profits." (*Id.* at 94:15-17.) Moreover, although the company did not have written performance evaluations, Mr. Volpe stated that he had observed a drop in the quality of Tokash's work over the last few years of her employment. (*Id.* at 159:13-23.) Mr. Volpe also testified to three different occasions where it had come to his attention that Tokash had not been diligent in responding to Board of Director members of H.A.R.I.E., which potentially had a detrimental effect on the business. (Defs.' Stmt. at ¶ 25(c)). Tokash contests these assertions. Mr. Volpe also noted, among other complaints including that Tokash had taken a hotel bathrobe on a company trip, that there

was a general feeling among the employees that Volpe had grown discontented with her job (*Id.* at ¶ 25(d)), all of which Tokash also denies.

Mr. Volpe confirmed that it was almost exclusively Linda Williams who both championed letting go of Tokash and rehiring Moore. (C. Volpe Dep. at 192:9-17.) He testified that "[t]he most feedback on [Tokash] in terms of job performance, in terms of her being let go and in terms of who to hire back came from Linda Williams." (*Id.* at 192:14-17.) Specifically, Mr. Volpe remembered that Williams requested that Moore be trained and rehired as Williams had worked closely with Moore and was impressed by her potential. (*Id.* at 142:8-17.) Mr. Volpe believed that although Williams was not expressly trained for the job, she was "exceptionally qualified" and that she could "pretty much do every job in the company." (*Id.* at 146:3-15.)

Initially, Tokash "just figured [she] was getting laid off because of [her] age." (Tokash Dep. at 199:13-14.) Further, Tokash testified that Linda Williams commented to her over the phone at the time of her layoff that "it's a shame that you and Joe got caught up in this because of your age." (Defs.' Stmt. at ¶ 29; Tokash Dep. at 199:22-200:5.) This apparently referenced Joseph P. Schirra who also had been laid off and was seventy-three (73) years old at the time. Williams, in her deposition, denied ever making such a statement. (Williams Dep. at 84:10-85:3.) Similarly, Tokash testified that Eleanor Volpe–the nominal vice president of Excalibur and Foxco–expressed similar sentiments upon learning of Tokash's departure. (Eleanor M. Volpe Dep. at 50:6-12, Oct. 12, 2011; Defs.' Ex. P; Tokash Dep. at 200:11-201:21.) Specifically, Eleanor Volpe asked Tokash why she wanted to work, noting that "90% of the people your age are retried" and further asking "who is going to want to hire you at your age?" (Defs.' Stmt. at ¶ 31; Tokash Dep. at 200:19-201:1.) Eleanor Volpe also

allegedly noted that Tokash had gone "a year and a half past the retirement age of sixty five." (Tokash Dep. at 201:11-14.)   Eleanor Volpe did not recall having made these statements. (Eleanor M. Volpe Dep. at 24:24-26:9.)  Further, Eleanor Volpe testified that she was under the impression that Tokash had voluntarily retired at the time of her alleged comments, and that she was not even involved in the layoff process.  (*Id.* at 20:6-17, 24:19, 26:10-17.) Tokash disputes this and points out that Mr. Volpe testified that Eleanor Volpe was in charge of Foxco's personnel and policy matters.  (C. Volpe Dep. at 42:5-19.)

Finally, the employee manual for Foxco and Excalibur employees provides that "all employees will be subject to a compulsory retirement upon attaining age 65."  (Pl.'s Ex. C at 4.)  In his testimony, Mr. Volpe equivocated as to whether he knew there was such a manual in force, but he was clear that he never looked at it.  (Volpe Dep. at 38:23-24, 81:17-82:15, 190:4-8.)   In any event, Mr. Volpe testified that he ran the company as if the guidelines "didn't exist" and that the employees were aware of his disregard for the policy. (*Id.* at 83:13-22.)  In particular, Mr. Volpe added that he was unaware of the policy before Tokash brought it to his attention, to which he responded that there was "no manual as far as [he was] concerned" and that Tokash could continue in her employment as long as she wanted.  (*Id.* at 122:14-24.)  Tokash agreed that Mr. Volpe informed her that it was her call and that she could work beyond the age of sixty-five (65).  (Volpe Dep. at 97:17-25.)

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit

under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

9

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)).  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla."  *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## ANALYSIS

**I.     Applicability of the Age Discrimination in Employment Act**

The Defendants argue that since Foxco employs too few employees to be covered by the ADEA, Tokash may not recover under the Act.  Tokash does not dispute that Foxco, if it were a sole employer, would fall outside the Act's purview.  Instead, Tokash argues that she should be considered an employee of the larger entity, Excalibur, under either the single or joint employer test.  Because there are facts suggesting sufficient entanglement between these two entities, the Court finds that the single employer test potentially applies.

The ADEA applies to employers who have "twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  29 U.S.C. § 630(b).  Charles J. Volpe, Jr. stated that he did not "believe Foxco ever approached 20 people."  (C. Volpe Dep., 185:18-23.)  Similarly, Linda Williams in her deposition made an offhand statement that "Foxco was a small entity with 11 or less

employees." (Williams Dep. at 87:14-15.)  Defendants point to a 2008 filing with the Commonwealth of Pennsylvania indicating that Foxco only employed thirteen employees during that period.  (Defs.' Ex. E.)  The Court finds no suggestion in the record that Foxco actually employed more than twenty people at any time.  In fact , Tokash was unsure exactly as to how many employees Foxco employed, but could not say it was more than twelve.  (Tokash Dep. at 88:1-89:9.)  Therefore, Foxco, as a singular entity, falls outside of the ADEA's jurisdiction.

There are certain situations in which employees can be aggregated between nominally distinct employers for the purposes of establishing the requisite size for Title VII / ADEA[2] liability.  First, multiple companies can be construed as "joint employers" where they are "independent legal entities that have merely 'historically chosen to handle jointly important aspects of their employer-employee relationship.'" *Myers v. Garfield & Johnson Enters.*, 679 F. Supp. 2d 598, 607 (E.D. Pa. 2010) (quoting *NLRB v. Checker Cab Co.*, 367 F.2d 692, 698 (6th Cir. 1966)).  The joint employer test looks to "whether or not 'one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the

---

[2]The employee aggregation methods outlined above have evolved within the Title VII context, and neither party has presented any authoritative guidance about how to approach such aggregation within the ADEA context.  However, in light of the similar language within the two Acts, courts have analogized situations under the ADEA to those in the Title VII context.  *See, e.g.*, *DeAngelo v. DentalEZ, Inc.*, CIV.A. 09-535, 2011 WL 1496513, at *2 (E.D. Pa. Apr. 15, 2011) (applying the Title VII integrated enterprise analysis to a claim of age discrimination under the ADEA); *Vrabel v. Greater Johnstown Water Authority*, Civ. Act. No. 3:2006-73, 2008 WL 868152 at *8 (W.D. Pa. Mar. 31, 2008) (holding the Title VII joint employer analysis applicable to the ADEA); *cf. Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (internal quotations and citation omitted) (noting that "the substantive provisions of the ADEA were derived in *haec verba* from Title VII.").

employees who are employed by the other employer.'" *Butterbaugh v. Chertoff*, 479 F.

Supp. 2d 485, 491 (W.D. Pa. 2007) (quoting *NLRB v. Browning-Ferris Industries, Inc.*, 691

F.2d 1117, 1123 (3d Cir. 1982)).  This boils down to three core inquiries:

> 1)   Authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours;
> 2)   Day-to-day supervision of employees, including employee discipline; and
> 3)   Control of employee records, including payroll, insurance, taxes and the like.

*Id.* (quoting *Cella v. Villanova Univ.*, No. 01-7181, 2003 WL 329147, at *7 (E.D.Pa. Feb 12,

2003)).

Secondly, a "single employment relationship," exists where "nominally separate

entities are actually part of a single integrated enterprise so that, for all purposes, there is

in fact only a 'single employer.'" *Myers*, 679 F. Supp. 2d at 607 (quoting *Browning-Ferris*,

691 F.2d at 1122).  The Court of Appeals has identified three instances in which this can

occur: (1) where a company's split into smaller entities was substantially motivated by a

desire to downsize below the statutory minimum; (2) where a parent company has directed

the subsidiary to perform the allegedly discriminatory act; and (3) where two separate

companies' "affairs are so interconnected that they collectively caused the alleged

discriminatory employment practice." *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 86 (3d

Cir. 2003).

The Court finds no evidence in the record indicating that Foxco employees were

controlled by Excalibur employees to the extent necessary to suggest a joint employment

relationship.  While there is evidence that Tokash may have been supervised on certain

assignment by Excalibur staff, there are no facts suggesting that Excalibur had authority to

dictate terms of the Foxco employees' employment or that Excalibur oversaw any other Foxco employees in a capacity going beyond discrete assignments.   Rather, the facts suggest that the two corporations may have been sufficiently entangled to be construed as a sole employer.   That analysis, instead of looking to control, "rests on the degree of operational entanglement–whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another."   *Id.* at 87. More practically, the necessary considerations include:

1)   The degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (e.g., hiring and personnel matters);

2)   Whether they present themselves as a single company such that third parties dealt with them as one unit;

3)   Whether a parent company covers the salaries, expenses, or losses of its subsidiary; and

4)   Whether one entity does business exclusively with the other.

*Id.* These factors were designed as "an intentionally open-ended, equitable inquiry." *Id.*

In *Nesbit*, the Court of Appeals failed to find such operational entanglement in a claim of gender discrimination made against one of three automotive companies owned and managed by a singular family. *Id.* at 75. Specifically, the plaintiff's nominal employer, Gears, was ten percent owned by its founder with the remainder held in trust for his children. *Id.* The founder was also the president and his children were its corporate officers. *Id.* Even though the founder was president and co-owner (with his wife) of the alleged joint employer, Winters, the Court of Appeals held that no reasonable jury would find the two entities substantially consolidated. *Id.* at 75, 88. Aside from the common ownership and management, there were no additional factors suggesting entanglement. *Id.* at 89 n.11. In particular, the companies had different managers, operated at arm's length, and there were

13

no indications that either of the two entities ignored corporate formalities.  *Id.* at 88-89.

Relying on *Nesbit's* operational entanglement formulation, a district court for the Eastern District of Pennsylvania found that a material issue existed as to the existence of a joint relationship between employers where there was financial support between the two entities as well as shared management, consolidated benefits, and shared ownership. *DeAngelo v. DentalEZ, Inc.*, CIV.A. 09-535, 2011 WL 1496513, at *4 (E.D. Pa. Apr. 15, 2011).  Weighing against entanglement was that each entity had its own general manager, conducted its own hiring, did not exclusively do business with the other, and each maintained its corporate form.  *Id.* at *3.  Conversely, the two entities shared a common individual owner, and there was evidence that the smaller corporations were all overseen by one management team, were provided daily capital contributions, and were all subjected to uniform insurance, legal, accounting, treasury, and personal/human resources services.  *Id.*  As stated, these facts were enough for the plaintiff's complaint to survive summary judgment.

Unlike *Nesbit*, here there are factors suggestion entanglement which go beyond common ownership and management.  And, in applying the equitable inquiry prescribed by *Nesbit*, there are sufficient facts indicating a single employment relationship.

First, there are facts in the record suggesting that the entities considered themselves as one integrated unit.  For example, the employee manual for the different companies consistently refers to the three corporations[3] as "our company" (Pl.'s Ex. C at 4), and to the different entities as different "locations," noting that "the duties of a particular employee may

---

[3]The three corporations refer to Volpe Insurance Agency, Inc., Foxco Insurance Management Services, Inc. and Excalibur Insurance Management Services, Inc.  (Pl.'s Ex. C.)

include/overlap more than one position at these locations" (*Id.* at 6).  While it is not entirely clear from the record whether the entities presented themselves as a single company such that third parties dealt with them as one unit, it is compelling that Tokash's work e-mail address was "Ctokash@excaliburinsurancemanagement.com" (Tokash Dep. at 142:21-23), which could well communicate to the outside world that she was an employee of Excalibur. Tokash further testified that it was her understanding that all other Foxco employees were also assigned e-mail addresses which incorporated the same "@excaliburinsurancemanagement.com" domain. (*Id.* at 142:24-143:3.) Moreover, Tokash's work for Excalibur, which does not seem to have been expressly attributed to Foxco, further suggests seamless integration.  And, that Wallick–an Excalibur employee–worked in the same office as Tokash and reviewed her work for Excalibur, only further blurs the lines between these two entities.

Secondly, there was a very high degree of unity between the two corporations with respect to ownership, management, and business functions.  As to ownership, both entities were wholly owned by–with the exception of Eleanor Volpe–the same Volpe family members in differing proportions.  As to management, Mr. Volpe was president and CEO of both Excalibur and Foxco, directing the work for both entities.  Mr. Volpe acknowledged that he treated these organizations as "one big umbrella" and was "not exactly sure what [were] the Foxco employees and what [were] the Excalibur employees." (*Id.* at 24:8-13.)  As such, Tokash was subjected to Mr. Volpe's management regardless of which entity she was performing work for, and she considered him to be her boss.

Further amalgamations of management also suggest operational entanglement.  They shared the same vice president, Eleanor Volpe (Eleanor M. Volpe Dep. at 50:6-12, Oct. 12,

2011; Defs.' Ex. P), and there were managerial employees assigned to both, such as Jack Judge who served as claims manager for both (C. Volpe Dep. at 46:11-18). As to personnel matters, Barbara Jones, another employee of both Foxco and Excalibur, handled payroll and insurance matters for both employers. (Joseph Patrick Schirra, Jr. Dep. 81:1-10, Jan. 11, 2012.) And, Foxco and Excalibur employees were insured under a singular health insurance plan. (C. Volpe Dep. at 169:18-170:7.) As in *DeAngelo*, the unification of these logistical operations is indicative of entanglement. And, highly pertinent in the *Nesbit* analysis, there is evidence in the record that Foxco and Excalibur disregarded corporate formalities. Specifically, it appears that neither had formal shareholder or board of director meetings and that minute books were not maintained. (Volpe Dep. at 50:20-51:16.)

As to the remaining considerations, while there is no suggestion that either Defendant conducted business exclusively with the other, the facts before the Court suggest that the finances were blurry between the two. As the economy slowed in the first quarter of 2008, Defendants Foxco and Excalibur together lost revenue of one million dollars and layoffs were conducted across the two different companies. Specifically, in laying off Tokash and others, Volpe solicited the opinions of several individuals "based on their department heads and people in responsibility of our company who [he] looked to to follow their recommendation." (C. Volpe Dep. at 31:12-17.) Such advisors included Gerard Wallick, John Judge, Linda Williams and Michael Doyle (*Id.* at 31:18-25.), half of which were listed as employees of Foxco and half of Excalibur. (Pl.'s Ex. A; Pl.'s Ex. D.) This unified approach to trimming staff alone suggests that the "operations of the companies [were] so united that nominal employees of one company are treated interchangeably with those of another." *Nesbit*, 347 F.3d at 87.

16

Therefore, while it is true that Tokash was employed and paid by a legally distinct entity, there are material facts in the record suggesting that these two employers may be properly construed as a sole employer for ADEA purposes.  While employer status under the ADEA is generally an issue of law for a court to decide, "if there is a genuine issue of fact or conflicting inferences  can be drawn from the undisputed facts, then the determination of the employment status is a question of fact for the fact finder to resolve."  *Alba v. Hous. Auth.*, 400 F. Supp. 2d 685, 692 (M.D. Pa. 2005).  Therefore, since the facts in the instant matter raise a genuine issue as to whether a sole employment relationship exists between Excalibur and Foxco, the Court will deny the Defendants' Motion for Summary Judgment on this issue.

## II.    Facts Suggesting the Existence of Age Discrimination

The ADEA[4] makes it unlawful "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 621(a)(1). Of course, the purpose of this statue is to "prohibit age discrimination in employment" and "to promote employment of older persons based on their ability rather than age."  29 U.S.C. § 621(b).

To succeed on an ADEA claim, a plaintiff must make a showing either by "(1) presenting direct evidence of discrimination that meets the requirements of Justice O'Connor's concurring opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 261, 104 L. Ed. 2d 268, 109 S. Ct. 1775, 1796 (1989), or (2) presenting indirect evidence of

---

[4]This analysis applies with equal force to Tokash's PHRA claims as both are evaluated coextensively.  *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998).

discrimination that satisfies the familiar three-step burden shifting framework identified in *McDonnell Douglas*." *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 300 (3d Cir. 2004) (footnote omitted, referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Where indirect evidence is being relied upon, it is appropriate to proceed under the *McDonnell Douglas* analysis. *Id.*

The evidence Tokash presents is most appropriately analyzed as indirect evidence. This is not to say that she could not recover under a direct evidence theory. In particular, evidence of a mandatory retirement age may serve as such direct evidence. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (noting that a policy which is "discriminatory on its face" constitutes direct evidence, although only the first step of the inquiry). However, the testimonial evidence Tokash presents–namely statements by individuals who were evidently influential but not ultimate arbiters–is typically not considered direct evidence. *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 n.2 (3d Cir. 2002) (finding agreement by courts that statements by non-decisionmakers are not direct evidence). Tokash counters that a "cat's paw" theory of liability may apply, a mechanism to impute discriminatory conduct by a non-decisionmaker to a company where "those exhibiting discriminatory animus influenced or participated in the decision to terminate." *Burlington v. News Corp.*, 759 F. Supp. 2d 580, 599 (E.D. Pa. 2010) (quoting *Abramson v. William Paterson College*, 260 F.3d 265, 286 (3d Cir. 2001)). However, here, there is no evidence in the record that any of the speakers–namely Linda Williams–held the necessary age-related animus to proceed under this theory. *See Greenawalt v. Clarion Cnty.*, 459 F. App'x 165 (3d Cir. 2012) (quoting *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir.2001)) ("A plaintiff may proceed on this theory if [s]he offers evidence that 'those

18

exhibiting discriminatory animus influenced or participated in the decision to terminate' [her].").

In looking at indirect evidence, the *McDonnell Douglas* test requires that the plaintiff always bear the burden of proof and the initial burden of production in making out a prima facie case of age discrimination.   *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).  Such a prima facie case requires a plaintiff to "demonstrate that he or she (1) was over the age of 40; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination." *Barbee v. SEPTA*, 323 Fed. Appx. 159, 161 (3d Cir. 2009) (citation omitted).   Once this is established, the employer then bears the burden of production[5] in order "to identify a legitimate non-discriminatory reason for the adverse employment action."  *Smith*, 589 F.3d at 690.  "This burden is 'relatively light' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion

---

[5]Of course, the burden of *persuasion* must always lie with the plaintiff.   *Smith*, 589 F.3d at 690.  In *Gross v. FBL Financial Services*, 557 U.S. 167, 129 S. Ct. 2343, 2350 (2009), the Supreme Court held that the ADEA does not allow for mixed-motive age discrimination claims,  in other words, that "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  Such 'but-for' causation must be established by a preponderance of the evidence, either direct or circumstantial.  *Id.* at 2351.  The Supreme Court then rejected the burden shifting encouraged under the *Price Waterhouse* analysis—"The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision."  *Id.* at 2352 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).  In light of *Gross*, the Court of Appeals has determined that while shifting the burden of persuasion would be inappropriate, *McDonnell Douglas* only shifts "the burden of production (i.e., of going forward) . . . to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision."  *Smith*, 589 F.3d at 691.  "Hence, *Gross*, which prohibits shifting the burden of persuasion to an ADEA defendant, does not forbid our adherence to precedent applying *McDonnell Douglas* to age discrimination claims."  *Id.*

that there was a nondiscriminatory reason for the unfavorable employment decision.'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994)).

If that burden is met, the plaintiff then must produce evidence establishing that the employer's non-discriminatory reason is merely pretextual. *Smith*, 589 F.3d at 690. At trial, a plaintiff must prove that the employer's reason was false and that discrimination was the sole and determinative factor behind the decision. *Fuentes v. Perskie*, 32 F.3d 759, 763-64 (3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 113 S. Ct. 2742, 2752 (1993)). However, to merely withstand summary judgment, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764. At the summary judgment stage a plaintiff with a prima facie case need only point to facts discrediting the employer's stated reasons and does not yet need to provide evidence that discrimination was the sole and determinative factor. *Id.*

The Defendants concede that Tokash has established a prima facie case of age discrimination, but argue that she has not presented evidence that their non-discriminatory reasons are pretextual. (Defs.' Br. at 23, Doc. 25.) The Defendants cite a list of factors underlying Tokash's layoff: business losses in a slowing economy; Linda Williams's recommendation; the three instances in which Tokash supposedly faltered with the requests of the H.A.R.I.E. Board of Director members; and her overall work demeanor. That Moore, a much younger employee, was a better choice they argue was "purely and simply a legitimate business judgment decision." (*Id.* at 25.)

20

Tokash has met her burden to survive summary judgment by pointing to direct evidence from which a factfinder could reasonably disbelieve the Defendants' articulated legitimate reasons for her being selected for layoff.   While it is uncontested that the Defendants were having financial trouble at the time of the layoffs, there are material facts in dispute as to why Tokash in particular was selected for termination from which a reasonable jury could find in her favor.  Specifically, Tokash has testified that Williams–an individual intimately involved in the layoff process–expressed to Tokash that she was let go because of her age.  This testimony, far more than mere conjecture or speculation about a business decision, alone provides a genuine issue of material fact and renders this issue inappropriate for summary judgment.   The   Defendants argue that this should not be considered as "[s]tray remarks by non-decision maker or by decision makers unrelated to the decision process are rarely given great weight, particular if they were made temporally remote from the date of the decision."  (Defs.' Br. at 28, Doc. 25 (citing *Pivirotto v. Innovative Sys.*, 191 F.3d 344, 359 (3d Cir. 1999).)  While true, the facts indicate that Linda Williams was intimately involved in the decision-making process surrounding the layoffs and any comments by her are therefore highly relevant.  Moreover, it is hardly a stray remark where it was indicated to the plaintiff that she "got caught up in it because of [her] age."  The comments allegedly made by Eleanor Volpe suggesting age discrimination also contribute to this determination.  These comments carry less weight than Williams's as they came long after the layoff decision and since there is no suggestion that Eleanor Volpe contributed to the determination to layoff Tokash.  Yet, such a statement by a company's vice president–if true–could certainly contribute to a jury's finding in Tokash's favor.

Finally, Defendants' reliance on *Escobar v. Office of Disabled Persons Investigating*

21

*Official*, 797 F. Supp. 70 (D.P.R. 1992), is unhelpful to their case.  There, unlike the instant case, a court granted summary judgement against a plaintiff's ADEA claim where she failed to make out a prima facie case, specifically that she was qualified for the position.  *Id.* at 74. More importantly, in considering pretext, that court concluded that the plaintiff had failed to provide any proof on the issue of pretext and had only "question[ed] defendant's articulated reasons."  *Id.* at 77.  Moreover, that court found the plaintiff's reasons "simply bare" in suggesting that age discrimination was the hidden motive as opposed to any other rationale. *Id.* Here, conversely, there are concrete facts in the record which, if true, would affirmatively undermine the Defendants' stated reasons for Tokash's layoff.[6]

Therefore, as Tokash has at least made out a indirect case of age discrimination to survive summary judgment, the Defendants' Motion will be denied.

## CONCLUSION

The record contains sufficient facts indicating that the two Defendants may be properly construed as a single employer.  As such, the Defendants cannot escape at the summary judgment stage by presenting evidence that Foxco is too small of an employer to be held to the requirements of the Age Discrimination in Employment Act.  Further, there is at least one issue of material fact in dispute as to whether Plaintiff Carol Tokash's layoff was pretextual, and summary judgment also will not be granted in the Defendants' favor on liability under the Act.

---

[6]The briefs before the Court disagree about the appropriate amount of deference a court should give to interested witness testimony.  The Court of Appeals, however, has directed that courts should not automatically disregard testimony of an interested witness, but "should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness."  *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007).

22

However, as Tokash has withdrawn her claims are issues of gender discrimination,

the Defendants' Motion for Summary Judgment will be granted on those claims.

An appropriate order follows.


 May 14, 2012                                          /s/ A. Richard Caputo
Date                                                    A. Richard Caputo
                                                        United States District Judge